1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION
============================

JAIME GUIJOSA-SILVA,                "
et.al.
            PLAINTIFFS              "
                                              Civil Action No.
VS                                  "
                                                 7:10-CV-00017-HL
WENDELL ROBERSON FARMS,             "
INC., THOMAS ROBERSON and
JANIS S. ROBERSON,                  "
            DEFENDANTS
=================================================================
Tifton, Georgia              10:30 a.m.           March 2, 2011


        Deposition of JORGE GOMEZ, witness called before

Julia J. Scarborough, Certified Court Reporter, Certificate

No. B-908; testimony taken at 244 E. 2nd Street, Tifton,

Georgia, beginning at approximately 10:30 a.m., March 2, 2011.




=================================================================
NOW OFFERING VIDEO CONFERENCING

HAWTHORNE & WEBB COURT REPORTING
149 River Hills Lane
Macon, Georgia 31211
(478) 746-2295 & (478)477-9356
hawthorne-webb.com

2

1  APPEARANCES:

2  FOR PLAINTIFFS:            DAWSON MORTON, of
                              Georgia Legal Services
3                             Suite 250, 104 Marietta Street, NW
                              Marietta, GA  30303
4
   ALSO PRESENT:              HEATHER BARGERON
5                             JORDAN CUNNINGS

6  FOR DEFENDANTS:            JOHN C. SPURLIN, of
                              Spurlin & McCorvey
7                             P. O. Box 7566
                              Tifton, GA 31793
8

9                        INDEX

10

11   1.  DIRECT EXAMINATION                    3

12  BY MR. MORTON

13   2.  CROSS EXAMINATION                     21

14  BY MR. SPURLIN

15   3.  REDIRECT EXAMINATION                  28

16  BY MR. MORTON

17

18  STIPULATIONS:

19        *** REPORTER'S NOTE:  Reading and signing of

20     transcript is WAIVED by witness.***

21        MR. MORTON:  This is going to be the deposition of

22     Jorge Gomez.

23

24

25

HAWTHORNE & WEBB

3

1                           JORGE GOMEZ

2                    Witness having been first

3                     duly sworn, testified on

4                     DIRECT EXAMINATION

5    BY MR. MORTON:

6         Q     Can you state your name for the record?

7         A     Jorge Gomez.

8         Q     Have you ever given a deposition before, Mr. Gomez?

9         A     Not that I can recall, no.

10        Q     Well, because everything is being recorded, you need

11   to give a verbal response, and if you do not understand a

12   question, please feel free to ask me to restate it.

13        A     Okay.

14        Q     And if you answer the question, I will assume you

15   understood it.

16        A     Okay.

17        Q     Could you tell me where you work, and what your

18   position is?

19        A     I work with the Georgia Department of Labor, and my

20   position is operations analyst.

21        Q     What does an operations analyst do?

22        A     I oversee the H-2A program, the agricultural -- I

23   mean, the agricultural employers' program, and the migrant and

24   seasonal farm worker program.

25        Q     So fair to say that you focus on the agricultural

4

1    issues?

2         A    Yes.

3         Q    Where is your office located?

4         A    I report directly to the central office in Atlanta.

5    I am now stationed in Douglas.

6         Q    How long have you held your position?

7         A    This current position I am about a year and a half,

8    I think.

9         Q    And what was your prior position?

10        A    Supervisor for the Tifton Career Center.

11        Q    In either your present position or your past

12   position, did you supervise the guy who was just here, Sam

13   Martinez?

14        A    Yes.  I supervised him for a little over a year, I

15   think.

16        Q    I am trying to think of how -- he explained a little

17   bit the referral process to us at the Georgia Department of

18   Labor.  I am just trying to think of -- do you have any reason

19   to think they -- I am trying to think of ways to speed it

20   along -- that in terms of the -- well, I will just try and go

21   through quickly what Sam Martinez said, and you can just tell

22   me if you have any different knowledge.

23             MR. MORTON:  Does that sound all right, John?

24             MR. SPURLIN:   That's probably okay.

25        Q    MR. MORTON:  In terms of just how the referral

HAWTHORNE & WEBB

1    process works, Mr. Martinez said that with an H-2A employer

2    there is a referral sheet that is faxed to the employer, and

3    then a referral record that's kept in the Georgia Department

4    of Labor computers, and then with a non H-2A employer that

5    there is a referral sheet, or a referral card that's

6    generated, and a record kept in the Georgia Department of

7    Labor computers; does that sound --

8         A    That's about right, yes.

9         Q    Do you have any -- like, we were just talking about

10   how referrals are generated, and what kind of documentation

11   that exists from them.  And he also talked about that

12   referrals are made to a job order so that there were going to

13   be a job order number when a referral is made?

14        A    That's correct.  There have been some changes,

15   however, in the past year or so.  Central office is the

16   holding office for the H-2A job orders, and they send out the

17   referrals to the employer, or requesting the referrals sent

18   out to them to see if there are any hires, they handle that.

19        Q    Okay.  And just when -- we are mostly talking about

20   2008 and 2009 for our purposes today; is that a change that

21   would have been made after that?

22        A    This change took effect -- oh, my goodness, that's

23   when I came aboard.  In September of 2008, I believe, I

24   started working for the central office, and shortly thereafter

25   they made the changes as to the central office keeping records

1    of the referrals for the H-2A employers.

2        Q    Just so I understand what that change is, that

3    change wasn't a change in what type of records were created,

4    but just where they were kept?

5        A    That's correct.  In the past the local career

6    centers would be the ones in charge of handling the referrals,

7    and then submitting the information to central office, and now

8    central office does that direct with the employer.

9        Q    Okay.  But the type of records that are generated --

10       A    Are the same.

11       Q    Mr. Martinez said that he couldn't make referrals

12   without a job order; that in order to make a referral, there

13   needed to be a job order in the system?

14       A    In order to be entered as a -- if you register a

15   customer, and in order -- yeah, pretty much the standard

16   procedure is if you register somebody, in order to be

17   referred, there has to be a job order in the system.

18   Otherwise, it's known as a job development contact, if there

19   is no job order in the system for that particular employer.

20       Q    Are job development contacts also recorded?

21       A    Yes, at the local career center; if something comes

22   about, yes.  I mean, what you are doing, basically, is just

23   telling a customer that they may want to go and see a certain

24   employer to see if they are hiring.  If they're interested,

25   you can contact that employer while the customer is there, and

1   if they say yes, send them on, you enter that into the work

2   history of the customer that a JD was done, and it shows up

3   what employer he was sent out to.

4        Q    Do you have any memory of having done that as to

5   Wendell Roberson Farms in the last three years, like, 2008,

6   since?

7        A    Which part, referring them to a job order system, or

8   a job development?

9        Q    First job development.

10       A    Job development, when I was -- let's see, what were

11   those years again?

12       Q    Like, the last three years, like, 2008 to the

13   present.

14       A    No.  In 2008 I became the unit supervisor, and that

15   was not part of my duties, no.

16       Q    Do you have any specific memory of doing that in any

17   prior years, like, rather than -- the job development contact

18   rather than a referral to a job order?

19       A    Yes, from 2001 to part of 2008, I think, April or

20   May, in 2008.  Yes, we would refer customers if they inquired

21   about the H-2A contract with Wendell Roberson.

22       Q    And you would refer them to the job order then?

23       A    Yes.

24       Q    Just to understand, that would be, then, a job order

25   referral rather than --

HAWTHORNE & WEBB

1      A      That's correct, yes.

2      Q      And any type of referral like that would then --

3   there would be a referral record generated?

4      A      Yes.

5      Q      It sounds like maybe for the time period we are

6   talking about that you weren't in a position that did this,

7   but do you have any memory of completing a non H-2A job order

8   for any positions at Wendell Roberson Farms?

9      A      From the past three years, no.

10     Q      If you could just flip through Plaintiff's 11 for a

11  second here?

12     A      (Witness complying).

13     Q      I am showing you a document, which I think is called

14  a referral report.

15     A      Yes.

16     Q      After you have a chance to look through this, do you

17  agree with me that if a referral had been made to Wendell

18  Roberson Farms during the time period of this report, which

19  looks like it's from 2004 to September 2010, that it would be

20  recorded in this document?

21     A      If they were registered, yes.  Now, there are some

22  instances where customers call in to the career center, and if

23  they are closer to the employer than to our career center,

24  they are not obligated to come in to have a referral given to

25  them.  They can go directly to the employer, and request for a

1    job with them.

2        Q    So somebody could have just gone -- not gone through

3    the Georgia Department of Labor?

4        A    Yes.

5        Q    When you say customers, are you referring to people

6    who are looking for jobs?

7        A    Yes.

8        Q    Do Georgia Department of Labor employees try to

9    record any referrals that they make?

10       A    Yes, by entering it into the system.  Every job

11   order has a referral page where they go in there, and if the

12   customer wants to be referred, they enter their information in

13   there and generate the referral letter to give to the

14   customer.

15       Q    Okay.  And --

16       A    Again, unless it's over the phone, and they are

17   closer to the employer, we tell them just report directly to

18   them.

19       Q    For those ones where -- would there be any record of

20   that communication, if somebody had called in?

21       A    No.  Some staff might write down their information,

22   but sometimes the customers do not want to give us their name

23   or social security, so.

24       Q    Do you have any knowledge of that occurring as to

25   Wendell Roberson Farms in the years 2008 to present?

HAWTHORNE & WEBB

1    A    In regards to what?

2    Q    The latter one, like if somebody calls in and you

3  send them there without recording any record?

4    A    Well, it's in the H-2A contract that if it's closer

5  for the customer to go directly to the employer, they do not

6  have to come through us, and the employer has to accept those

7  referrals.

8    Q    What I am asking, this is, like, do you have any

9  knowledge of that occurring as to Wendell Roberson Farms?

10   A    No.

11   Q    And Sam Martinez explained for us the -- just

12  looking at Plaintiff's 11, he explained for us, like, some of

13  these column headings, like he explained result description,

14  and said that, like, DNR work was did not report to work?

15   A    Did not report to work, yes, correct.

16   Q    Then there was DNR interview, which was did not

17  report to interview?

18   A    That's correct.

19   Q    And then hired?

20   A    Right.

21   Q    And he wasn't -- the refer code, do you have a

22  knowledge as to what the refer code means?

23   A    No.

24   Q    And the applicant, just that's also what you and the

25  Department of Labor would refer to as the customer, or the

1  client?

2       A    Yes.

3       Q    Do you have -- there was one other entry here that

4  says, not hired, other, I think on page three, for example,

5  there is an example of that.  Do you have an understanding of

6  what that means?

7       A    Not at the moment, no; it's been a while back.  I

8  could not tell you exactly what that means.

9       Q    It means they didn't get a job, but the reason

10 isn't --

11      A    Yes, not hired, other, but I couldn't tell you

12 exactly what; it's been a while back.  I no longer handle any

13 of this, since 2008, so.

14      Q    As part of your work at the Georgia Department of

15 Labor was it ever part of your work to, for example,

16 discourage employers from participating in the H-2A program?

17      A    No.

18      Q    Did you ever have any communications with the folks

19 at Wendell Roberson Farms suggesting to them that they not

20 participate in the H-2A program?

21      A    No.

22      Q    When would be the last time that you would have

23 communicated with somebody at Wendell Roberson Farms?

24      A    Probably prior to April of 2008.  I may have

25 contacted them to see if they were going to be submitting

12

1    another H-2A contract.

2         Q    And do you have a specific memory, like do you

3    remember what they told you?

4         A    I believe they said, yes.  And I think that was the

5    last time that I had contact with them.

6         Q    Do you know who you would have talked to when you

7    talked to them?

8         A    I know I spoke to three people there; it's either

9    Sid, his mom, or Lisa, those three, either of those three.  I

10   can't give you a definite as to which one of those.

11        Q    And those would be who you communicated with when

12   you talked to somebody there?

13        A    Yes.

14        Q    Did you ever make any type of representation to them

15   that there was a large number of local workers, and that they

16   didn't need to participate in the H-2A program?

17        A    No.  Usually when they submit a contract, it's

18   because they have determined that they cannot find any local

19   workers in the area.

20        Q    When you were checking to see if they were going to

21   submit a new contract, after they tell you that, is there

22   something you would do as part of your responsibilities at the

23   Georgia Department of Labor?

24        A    Yes.  If they tell me yes, the reason that we

25   contact them is to go ahead and schedule a housing inspection

13

visit.

Q    Do you know whether a housing inspection visit was scheduled?

A    At the time that I called, probably not.  Sam took over, and I think Sam did the last housing inspection in 2008 for them.

Q    Was that a housing inspection that you would have also participated in, or no?

A    I cannot remember, to be honest.  I know that I did go out with Sam when he took over my position to show him the location of all the H-2A employers, but to state for a fact that I was with him on that last one, I cannot recall.

Q    Would you ever have discussions -- like, as part of your position at Georgia Department of Labor, did you ever tell employers what they could charge for their housing?

A    It's in the contract that they cannot charge anything, if it's an H-2A contract.  For non H-2A, I have had several ag employers ask me, and we have told them that they cannot charge for rentals, that they -- there is a sheet form, a disclosure form on what they can charge and cannot charge, but that's handled by wage and hour, not by us.  And I don't know if this particular employer asked me that, or not.

Q    So you don't have any memory of having any conversation with them about that?

A    No, at this point I couldn't say.

HAWTHORNE & WEBB

14

1    Q     Is there any type of sheet you would have given to

2   them about -- like, wage and hour division standards as to --

3    A     Yes, there is a disclosure form that if they request

4   it, we give them one.

5    Q     And is that -- can you just describe for me what

6   that sheet is?

7    A     A disclosure form, it just says the location of the

8   housing, and if there are any charges; like, if there are

9   charges for electrical, if there are charges for gas, for

10   propane gas for the stove.

11   Q     Is that a blank form that you would give them?

12   A     Yes, it's a blank form.

13   Q     And then they could fill it out?

14   A     They could fill it out, yes.

15   Q     Do you remember ever having a conversation with

16   anyone at Wendell Roberson Farms about workers from Sanderson

17   Farms, or Sanderson Poultry?

18   A     No.

19   Q     Did you ever make any referral to Wendell Roberson

20   Farms of Sanderson Poultry, or Sanderson Farms workers?

21   A     I cannot say either yes or no, because we don't

22   usually ask a customer where they are coming from, where they

23   have worked before.  If they are just interested in being

24   referred to them, we would refer them to them.

25   Q     So, for instance, you don't have any specific

HAWTHORNE & WEBB

15

1    memory of referring Sanderson Farms or Sanderson Poultry

2    workers?

3        A    No.  No.

4        Q    If you had referred workers, you just wouldn't have

5    known where they worked previously?

6        A    Well, more than likely, yeah.  And plus, again, it's

7    been such a long time since I took over this; I could not

8    remember anything that far back.

9        Q    Okay.  When is, like, the last time that you would

10   have actually been involved in referring workers as part of

11   your work?

12       A    I would say some time in 2007, maybe the first part

13   of 2008.

14       Q    Sam Martinez also explained to us about referrals,

15   that referrals have an expiration date, and that the

16   Department of Labor wouldn't make referrals after that

17   expiration date?

18       A    On an H-2A order, yes, there is a -- there has been

19   some changes.  There is usually a 50 percent deadline on those

20   H-2A contracts, or a 30-day deadline, depending on which way

21   the contract was accepted.  Yes, after that deadline, no more

22   referrals are sent out from our career centers.

23       Q    And he said that that deadline -- well, for example,

24   Plaintiff's 84 was an example we used with him, this document

25   here, and he said that that deadline would be visible on the

HAWTHORNE & WEBB

1    front of the job order?

2       A    Yes, it's on this one, it's visible, it's got a 2/27

3    '08 expiration date; after that date no referrals could be

4    sent out to the employer.

5       Q    Okay.  We also talked a little bit about the

6    Department of Labor's role in verifying work authorization,

7    and when you had -- as part of your work responsibilities at

8    the Department of Labor, would you ever complete I-9s for

9    employers?

10       A    No.

11       Q    Did you ever represent to employers that workers

12    referred were legal?

13       A    No.  We did not verify the itemization for customers

14    who come into the Department of Labor.

15       Q    Did you ever instruct employers on how to complete

16    the I-9 form?

17       A    We had throughout the years agricultural forums

18    where we brought in the ag employers, and we would bring in

19    the proper agencies to show them how to fill out, like, I-9

20    forms, you know, what state and federal requirements were, and

21    give them the forms.

22       Q    Who would give that instruction then; like, do you

23    remember one of the --

24       A    The I-9s is the employer's sole responsibility.

25    They -- you know, they are supposed to, so that's -- it's on

17

them.

Q     So that's not something, for example, where you would have gone through with employers yourself and explained to them how to complete it?

A     If they asked -- if they asked, and we have had several employers that have asked, if we could look at their I-9s just to see if they are filled out properly, and then we look at them and we tell them something basic, like if there's something that we see is wrong, we tell them, you know, you might want to go over them again and recheck, because there is -- along with the I-9s, it's got the instructions how they have got to be filled out properly.

Q     Do you have any memory of going over that with anyone at Wendell Roberson Farms?

A     I could not recall.

Q     When do you think is the last time that you were actually out at Wendell Roberson Farms?

A     Again, it was probably either -- I would say probably September, October of 2007.

Q     Do you remember anyone from those -- when did you last have, like, one of those forms where there was instructions on this type of stuff?

A     Oh, my goodness, it's been a while back.  The last one that I can recall was in Douglas, but that one was not -- was not done by our department.  That was -- I am trying to

1    figure out who did it.  All we know is we got a memo from this
2    -- it was from a law firm that they were having this
3    educational workshop on how to fill out I-9s, and all the ag
4    employers in the area were invited.  And we sent out notice to
5    all the ag employers that this might be something that would
6    be in their best interest to attend.  But I cannot recall the
7    year.
8         Q    And you don't have any knowledge about who did or
9    didn't attend?
10        A    No.
11        Q    Did you ever have a conversation with the Robersons
12   telling them that there was a ready supply of legal local
13   workers to do their agricultural work?
14        A    No.  But they did mention to me that they might be
15   getting out of the H-2A program, because it was too
16   expensive.  And we did tell them if they did, you know, they
17   could contact us and we would try to get some domestic workers
18   for them.
19        Q    Do you remember when that conversation occurred?
20        A    I would say it was probably in the last three years
21   that I went down there to do a housing inspection, and they
22   kept telling me that it was getting too expensive to stay on
23   in this program, and eventually they would have to quit it.
24        Q    Who were you having that conversation with?
25        A    That was with Sid.

1      Q      Did you make any recommendations to him, like, one

2  way or the other?

3      A      No.  I was just telling him that if he did quit the

4  H-2A program, to give us a call, and we would try to help them

5  in finding some domestic workers for them.

6      Q      Do you know whether he called?

7      A      Once again, that was when I changed positions, so,

8  no, he didn't call me.  If he called, he didn't call -- I

9  didn't talk to him about it; it might have been Sam.

10     Q      Would you agree that if he had called some type of

11  job order would have been created?

12     A      Well -- yes, if he did call, yes.  If he did contact

13  us, and he wanted to place a local job order with us, yes, one

14  would be entered into our system, yes.

15     Q      Is there a policy if there is an existing H-2A job

16  order showing, like an H-2A wage rate, can the Department of

17  Labor make referrals to a separate minimum wage job order for

18  the same employer?

19     A      Now, that's a good question.  Right now I would say

20  no.  I would say it would have to be sent to the H-2A job

21  order.

22     Q      Which would have the higher wage rate?

23     A      Yes.  If it's the same type of work, now; if it's a

24  different type of work, they can enter a local job order

25  without any problems.

20

1      Q    So just to understand that point differently, for

2    example, if you had a job order for fieldwork, and you wanted

3    to hire a secretary, you could have separate job orders?

4      A    Yes.

5      Q    Could you have separate orders for fieldwork at the

6    same time?

7      A    We would probably have to look at that very closely,

8    and then send that up to central office and ask for guidance

9    on that.  We know that there have been some H-2A employers

10   that have hired on a separate crew, domestic crew, but not

11   coming through us.

12     Q    What is your understanding of the H-2A employers'

13   obligations in terms of pay when they hire on a separate

14   domestic crew?

15          MR. SPURLIN:  Object to the form.  You can answer

16     it.

17     A    THE WITNESS:  Could you repeat that question now?

18     Q    Sure.  And I'll understand that John has an

19   objection.  What is your understanding of that -- in that

20   example that you just brought up, where there is an H-2A

21   employer and they also hire on a domestic crew, what is your

22   understanding of their obligation as to the pay rate for the

23   domestic crew?

24          MR. SPURLIN:  The same objection.

25     A    THE WITNESS:  If they have called us and asked us,

HAWTHORNE & WEBB

21

1   in the past, you know, their intent of doing that, then we

2   refer them to wage and hour, because wage and hour is the one

3   that gives them the information on that.

4          MR. MORTON:  Let me take a quick break.  I don't

5      think I have any other questions.

6   (OFF THE RECORD)

7      Q    MR. MORTON:  I think I have just two more questions,

8   Mr. Gomez.  In terms of that scenario that you were talking

9   about where there is an outside crew, outside domestic crew,

10  do you have any knowledge about whether there had been such an

11  outside crew at the Robersons?

12     A    No, not -- no.  If there was, I don't have any

13  knowledge about that, no.

14     Q    And Mr. Martinez told us something about spot job

15  orders, which he basically just described as an effort by the

16  Department of Labor to record a referral that maybe had

17  occurred late, or that had been learned of late?

18     A    Yes.  A spot order is when one of the staff realizes

19  that one of the referrals sent out there was entered here as a

20  not hired, and then they find out that they, in fact, did get

21  hired there, so they are just trying to recover -- get credit

22  for that missed referral as a placement.

23          MR. MORTON:  I don't have any further questions.

24                      CROSS EXAMINATION

25  BY MR. SPURLIN:

22

1      Q    Mr. Gomez, I need to clarify a couple of things.

2  Mr. Morton asked you several questions about do you have

3  personal knowledge of things happening in the last three years

4  at Wendell Roberson Farms.  Isn't it true that you have not

5  been in the same job in the last three years --

6      A    That's correct.

7      Q    -- so you wouldn't have any personal knowledge of

8  that?

9      A    That's correct.

10     Q    And he asked you some questions about these

11  documents before you.  The document marked as Plaintiff's

12  Exhibit Number 11, is that an internal document of the

13  Department of Labor that y'all use to try to quantify how many

14  referrals you have made?

15     A    It's not more to quantify referrals, it's how many

16  placements.

17     Q    And that's used inside the Department of Labor to

18  demonstrate the effectiveness of your department?

19     A    Yes, as well as if the H-2A employer does hire at

20  least one domestic, a field check has to be conducted at that

21  place.

22     Q    I understand.  And the information in that report

23  comes from feedback from employers, correct?

24     A    That's correct.  There is a form that's sent out to

25  the employer with a list of all the referrals asking for them

HAWTHORNE & WEBB

1  to give us feedback as to who got hired.

2      Q      Would it be accurate to say that some farm employers

3  are more compliant than others in providing feedback?

4      A      Well, if they are in the H-2A program, they are

5  obligated to submit the feedback.

6      Q      What if they are not in the H-2A program?

7      A      It is sometimes very hard to get the employer to

8  submit that for a local job order, yes.

9      Q      Some are very compliant, and some have difficulty

10  giving any feedback?

11      A      That's correct, yes; and that's the same with all

12  regular customers, not just ag.

13      Q      You also mentioned that there are job development

14  contacts that would not be contained in that referral form?

15      A      That's correct.

16      Q      And sometimes people will contact your department,

17  and you will just say, well, I know of several farm employers

18  out there, we don't have job orders for them, but you may

19  check with them; is that correct?

20      A      That's correct, yes.

21      Q      And he asked you if you had personal knowledge of

22  that with respect to Wendell Roberson Farms, but you weren't

23  in that job those last three years, correct?

24      A      That's correct.

25      Q      All right, sir.  Now, I want to ask you a question

1   or two.  It's certainly legal and acceptable for a farmer,

2   like Wendell Roberson Farms, to hire employees that don't come

3   through the Department of Labor, isn't it?

4         MR. MORTON:  Objection.

5   A     THE WITNESS:  That's correct.

6   Q     And in your experience, do they often hire lots of

7   employees from other sources, other than coming through the

8   Department of Labor?

9   A     I am not aware of that.  The last thing I knew is

10  that they had hired a whole crew, a domestic crew.  And I

11  think that was told -- I was told that by Sam, I believe; it

12  might have been Sam.  So yes, it's perfectly legal for them to

13  hire, you know, workers without coming through the Department

14  of Labor.

15  Q     In your experience, Hispanic farm workers,

16  particularly, often find out about jobs through word of mouth

17  or gossip in their community?

18  A     Yes.

19  Q     It's not unusual for them to find out about work

20  through their neighbors?

21  A     That can be true, too, yes.

22  Q     Through other people that may work at a particular

23  employer?

24  A     Yes.

25  Q     And there is certainly nothing wrong with that, is

25

1    there?

2        A    No.

3        Q    Hispanic farmers workers, particularly, tend to bond

4    together, and do a lot together and trust each other more; you

5    would agree with that, wouldn't you?

6        A    Yes.

7        Q    And it's not unusual in your experience that they

8    communicate with each other about where they should go to

9    work, and what jobs there are?

10       A    Yes.

11       Q    The document marked as Plaintiff's Exhibit Number 11

12   is not intended in any way to represent everyone who may have

13   gone out to Wendell Roberson Farms through information

14   provided by neighbors, coworkers, or somebody other than the

15   Department of Labor?

16       A    That's correct.

17       Q    Now, Mr. Morton asked you a question or two about

18   verifying documentation of workers.  The Department of Labor

19   doesn't do that?

20       A    No.

21       Q    You assume the information they provide is

22   accurate?

23       A    That's correct.

24       Q    Now, you do, and somebody from the Department of

25   Labor does, annually, go see agricultural employers like

HAWTHORNE & WEBB

1   Wendell Roberson Farms?

2       A    We try, or the staff that is, at the time, in the

3   agricultural reach, try to go out, yes and meet with these

4   employers; however, you know, in the past couple of years,

5   because of the budget that we are -- has been cut into our

6   department, and it has limited the amount of times that the

7   agricultural division has gone out to visit these ag

8   employers.

9       Q    So the economy has affected the Department of

10  Labor's budget like everyone else?

11      A    Yes.

12      Q    And you would agree that there have been downturns

13  in employment opportunities for workers over the last three

14  years?

15      A    Yes.

16      Q    Are you aware in your job capacity of plants

17  closing, and cutbacks?

18      A    Yes.

19      Q    And he asked you a specific question about Sanderson

20  Farms.  Are you aware of any cutbacks in that type work, in

21  chicken plants, and other things in this area?

22      A    The name sounds familiar, but it's been such a long

23  time that that name was mentioned to me, and I cannot recall.

24      Q    I asked you a terrible question.  I didn't mean

25  particularly them, but are you aware of plants that have

27

1  either closed, or cut back, or lost jobs?

2      A     Yes.

3      Q     And there have been quite a few of those over the

4  last three years?

5      A     Oh, yes.

6      Q     Now, he asked you a question about any

7  communications you had with anyone at Wendell Roberson Farms

8  about a new H-2A contract in the spring of 2008.  Do you have

9  any specific recollection of the time of any such

10  communication?

11      A     No.

12      Q     Or exactly what was said?

13      A     No.

14      Q     Now, he also asked you questions about conversations

15  with Sid Roberson about getting out of the H-2A program.  Did

16  Mr. Roberson tell you that the farming operation was losing

17  money?

18      A     He told me that he could not continue the H-2A

19  program, yeah, because it was too expensive for him.

20      Q     Did he tell you that he had lost some of his best

21  vendors?

22      A     I do not recollect that, no.

23      Q     Did he tell you that the cabbage and turnip green

24  business had been going down over the last several years?

25      A     I can not recall that either.

1    Q    Did he tell you that on more than one occasion, or
2    was it just one occasion when he told you he was losing money
3    and needed to get out of the H-2A program?
4         MR. MORTON:  Objection, mischaracterizes.
5    A    THE WITNESS:  He told me that on more than one
6    occasion.
7    Q    Did he tell you that several times?
8    A    Yes.
9    Q    Was that over a period of several years?
10        MR. SPURLIN:  Thank you very much.
11                    REDIRECT EXAMINATION
12   BY MR. MORTON:
13   Q    Just to clarify, the thing that he told you on more
14   than one occasion was that the H-2A program was expensive?
15   A    Yeah, every year the rate was going up, and that he
16   didn't know how long he could continue with that program, but
17   that eventually they were going to have to get out of it,
18   because it was too expensive.
19   Q    Was there anything else said besides that?
20   A    No.
21        MR. MORTON:  I don't have any further questions.
22   DEPOSITION CONCLUDED:  11:15 p.m.
23
24
25

29

CERTIFICATE OF REPORTER

GEORGIA, JONES COUNTY:

   I, Julia J. Scarborough, CCR, B-908, CERTIFY that acting in such capacity March 2, 2011, I reported the testimony of JORGE GOMEZ, and on the foregoing pages, numbered 3 through 28, both inclusive, have transcribed a true and accurate transcript of the same.

   I FURTHER CERTIFY that I am not counsel for, nor related to any of the parties, nor am I interested in the event or the outcome thereof.

   WITNESS my hand and official seal this ____ day of March, 2011.


                   CCR

      Certificate No. B-908

HAWTHORNE & WEBB