**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

| | |
|---|---|
| **JAIME GUIJOSA-SILVA, et al.**, | |
| Plaintiffs, | |
| v. | Civil Action No. 7:10-CV-17 (HL) |
| **WENDELL ROBERSON FARMS, INC.,
et al.**, | |
| Defendants. | |

**ORDER**

This case arises from the temporary employment of Mexican farm workers in the United States through the Department of Labor's ("DOL") H-2A program. The Plaintiffs are twelve former H-2A guest workers who were employed by Defendant Wendell Roberson Farms ("WRF") at various times in the 2000s. In 2004, Plaintiffs filed suit against WRF for violations of the Fair Labor Standards Act ("FLSA"). *See* Vergara-Perdomo v. Wendell Roberson Farms, Inc., et al., Civil Action No. 1:04-cv-77-4 (WLS). Plaintiffs were successful in their suit against WRF. Now, Plaintiffs are back in court, alleging that WRF has retaliated against them for their participation in the Vergara-Perdomo lawsuit.

Before the Court are Defendants' Motion for Summary Judgment (Doc. 45) and Plaintiffs' Motion for Partial Summary Judgment (Doc. 55). For the reasons discussed below, the Defendants' Motion is denied and the Plaintiffs' Motion is granted.

## I. BACKGROUND

Wendell Roberson Farms is a family-owned farming operation located in Tifton, Georgia. The farm is managed primarily by Terrell Roberson, the President of WRF, Sid Roberson, the Vice President, and Janis Roberson,[1] the Secretary and Treasurer. (Doc. 56, p. 10-11.) The primary crops at WRF are turnips, greens, cabbage, mustard greens, collard greens, peas, and beans, though the farm also grows some wheat, corn, and peanuts. (Defendants' Statement of Material Facts[2] ("DSMF") ¶ 1.)

WRF began using the DOL's H-2A program approximately twenty years ago to help meet labor needs at the farm. (DSMF ¶ 1; Wendell Roberson Farms Deposition, p. 32.) The H-2A program allows the temporary employment of alien farm workers within the United States if an employer can show that (1) there are insufficient domestic workers who are willing, able, and qualified to perform the work at the time and place needed, and (2) the employment of aliens will not adversely affect the wages and working conditions of domestic workers. 8 U.S.C. § 1188(1)(A)-(B).

The H-2A program is heavily regulated by federal guidelines. Employers must compensate H-2A employees at a rate not less than the federal minimum wage, the prevailing wage rate in the area, or the "adverse effect wage rate," whichever is higher. 20 C.F.R. § 655.120(a). Additionally, employers are

---

[1]     Janis Roberson is the mother of Terrell Roberson and Sid Roberson.
[2]     All citations to the Defendants' Statement of Material Facts refer to facts that have been admitted by Plaintiffs.

obligated to provide housing at no cost to H-2A employees, 20 C.F.R. § 655.122(d), workers' compensation insurance coverage, 20 C.F.R. § 655.122(e), meals, 20 C.F.R. § 655.122(g), and transportation costs, 20 C.F.R. § 655.122(h). Employers also must guarantee to H-2A workers that the total number of work hours during the harvest season will be equal to at least three-fourths of the workdays that were initially advertised. 20 C.F.R. § 655.122(i).

WRF imported workers during their harvest season, which ran approximately from September to July. (WRF Dep., p. 37-38.) Workers could come to WRF for the whole season or for parts of the season. (WRF Dep., p. 38.) The relationship between the H-2A workers and WRF was without incident until 2004, when Plaintiffs filed the Vergara-Perdomo lawsuit against WRF under the FLSA.

For the sake of brevity, the Court will not recount all of the details of the relationship between Plaintiffs and Defendants over the last eight years. Suffice it say that the relationship between the parties has been tumultuous. In August 2005, Judge Louis Sands of the Middle District of Georgia entered a consent order against Defendants, guaranteeing rehire for the Vergara-Perdomo plaintiffs for the 2005-2006 crop season and forbidding WRF from using illegal labor instead of the H-2A program. Despite the court order, there were numerous complaints during the 2005-2006 season that WRF was disregarding the court's mandate not to use illegal workers. In March 2006, a second consent order was entered, requiring WRF to set up an account with SAVE/E-Verify, an online

service that checks the authenticity of documents given to the farm for tax purposes by potential employees. The consent order also mandated that WRF release the work crew of Delfino Rodriguez, a supervisor at WRF who was bringing illegal workers to the farm. This consent order also ordered WRF to pay the Vergara-Perdomo plaintiffs $40,000 in damages due to lost wages because of the illegal workers brought in by Rodriguez. In February 2007, the Vergara-Perdomo plaintiffs complained that WRF was violating the consent order by not rehiring them. In August 2007, the court entered an order finding WRF in violation of the two consent orders.

In the present case, twelve of the Vergara-Perdomo plaintiffs have filed suit against WRF, alleging retaliation. Four Plaintiffs maintain that Defendants retaliated against them because they were not rehired for the spring portion of the 2007-2008 harvest season. Those four Plaintiffs, along with eight additional Plaintiffs, also assert that they were not rehired for the 2008-2009 harvest season because of retaliation. Plaintiffs claim that in July 2008, they sent their names to WRF via fax, expressing interest in returning to the farm for the 2008-2009 season. (Doc. 1-7, p. 2.) Attorney Charlotte Sanders from Georgia Legal Services sent an additional letter to WRF on August 15, 2008, confirming the names of the workers that wanted to return to WRF. (Doc. 57-5.) Five days later, on August 20, 2008, WRF sent a letter to the DOL, withdrawing their H-2A job order for the 2008-2009 season. (Doc. 80-7.)

Plaintiffs allege that WRF's decision to withdraw their job order was motived by a desire to retaliate against Plaintiffs for filing their original lawsuit in 2004. Defendants, on the other hand, claim that their decision not to participate in H-2A was motived by business reasons including the expense of the H-2A program, the significant decline in business at WRF, and the lack of available work.

## II. **SUMMARY JUDGMENT**

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see* <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). A genuine issue of material fact arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986).

When considering a motion for summary judgment, the court must evaluate all of the evidence, together with any logical inferences, in the light most favorable to the nonmoving party. <u>Id.</u> at 354-55. The court may not, however, make credibility determinations or weigh the evidence. <u>Id.</u> at 255; *see also* <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150, 120 S. Ct. 2097 (2000).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of a material fact." Celotex, 477 U.S. at 323, 106 S. Ct. at 2553 (internal quotation marks omitted). If the moving party meets this burden, the burden shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact, or that the nonmoving party is not entitled to judgment as a matter of law. Id. at 324-26. This evidence must consist of more than mere conclusory allegations. See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). Under this framework, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

III. **ANALYSIS**

    a. **Evidentiary Issues**

The first matters requiring the Court's attention are Defendants' objections to twenty-seven of the exhibits submitted by Plaintiffs. Defendants raised these objections in their Reply Brief in Support of their Motion for Summary Judgment. (Doc. 94.)

The general rule regarding the admissibility of evidence on a motion for summary judgment is that the court may consider evidence that could be reduced to admissible evidence at trial. Macuba v. Deboer, 193 F.3d 1316, 1322 (11th Cir. 1999). Defendants' objections are addressed below.

### i.  **Objection 1: Exhibits 24, 33, 35, 51**

Defendants object to exhibits 24 (Doc. 82-7), 33 (Doc. 83-1), 35 (Doc. 83-3), and 51 (Doc. 85-7) on the grounds that these exhibits constitute inadmissible summaries. Defendants argue that the summaries are improper because they lack authentication. In response, Plaintiffs contend that the summaries have been properly prepared and are supported by evidence in the record and, therefore, constitute admissible evidence.

Rule 1006 of the Federal Rules of Evidence provides that "[t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation." FED. R. EVID. 1006. In this case, the summaries submitted by Plaintiffs are intended to condense evidence contained elsewhere in the record. For example, exhibit 24 is a chart that compares data from exhibit 20 (Doc. 82-3) (I-9s completed in November 2005) with data from exhibit 22 (Doc. 82-5) (names of employees listed on Defendants' 2005 payroll summary). Similarly, exhibit 33 is a compilation of data from exhibits 21 (Doc. 82-4) (2008 payroll check register) and 110 (Doc. 91-6) (2009 payroll check register). Likewise, exhibit 51 is a chart made by Plaintiffs to compare data from exhibit 20 (Doc. 82-3) with data from

7

exhibit 26 (Doc. 82-9) (different social security numbers used for employees with the same name). All of these exhibits are voluminous and it would be inconvenient for the Court to take the time to review, compare, and analyze each document. The payroll summaries consist of line after line of names and numbers that are difficult to understand. The I-9s, though easier to read, are numerous, and it would take time and effort to sort through them and pick out relevant dates and names. Therefore, because these three summaries are supported by other evidence in the record, they are found to be proper summaries under FRE 1006. The Court overrules any objection to Plaintiffs' use of these exhibits.

On the other hand, Plaintiffs' exhibit 35 is inadmissible because it is not supported by evidence. Exhibit 35 is a comparison of production data for H-2A workers and non-H-2A workers. Plaintiffs created the chart using information from Defendants' H-2A payroll detail text file from 2007 and Defendants' field tally sheet for non-H-2A workers from 2008. However, neither the information from 2007 text file nor the information from 2008 field tally sheet appears to have been submitted by either party. Without evidentiary support, the Court cannot allow a summary to be admitted under FRE 1006.[3]

---

[3]     Defendants also object to exhibit 35 because they argue it creates an inadmissible "inference of fact." However, courts have allowed charts or summaries into evidence even when there is some factual assumption, so long as there is adequate support. *See* United States v. Norton, 867 F.2d 1354, 1363 (11th Cir. 1989) ("the essential requirement is not that the charts be free from reliance on any assumptions, but rather that these assumptions be supported by

### ii.   **Objection 2: Exhibit 112**

Exhibit 112 (Doc. 91-8) is a timeline prepared by Plaintiffs beginning in August 2003 and lasting until the 2008-2009 harvest season. The timeline summarizes events that have taken place between Plaintiffs and Defendants within the scope of the Vergara-Perdomo litigation as well as the present case. Defendants object to this exhibit, arguing that it is not evidence, but is rather Plaintiffs' attempt to present irrelevant facts and circumstances.

In a retaliation case, facts should not be considered in isolation, but instead, should be considered within a broader context. *See* United States v. City of Montgomery, Ala., 788 F. Supp. 1563, 1573 n. 12 (M.D. Ala. 1992) (using "the long history of the defendants' retaliation against [the plaintiff] and other officers connected with her litigation" as evidence in a retaliation lawsuit). While it is true that irrelevant facts cannot be included in a timeline, Brown v. Bray & Gillespie III Mgmt. LLC, 2008 WL 2397601 (M.D. Fla. 2008), facts that are relevant are admissible even if presented in a chronological form.

In this case, the events that are included in the timeline are relevant to understanding the long history between Plaintiffs and Defendants. Therefore, the Court overrules the Defendants' objection to exhibit 112.

### iii.   **Objection 3: Exhibit 16 and Doc. 57-3**

---

evidence in the record."). Thus, Plaintiffs' fatal flaw with this exhibit was not the inference, but rather the failure to support the chart with evidence in the record.

Defendants object to Exhibit 16 (Doc. 81-8) and Doc. 57-3, letters written by Sid Roberson on behalf of WRF dated July 28, 2008 and August 12, 2008, on the basis that these documents constitute settlement offers that are barred under Federal Rule of Evidence 408. Rule 408 provides that

> [e]vidence of the following is not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount or to impeach through a prior inconsistent statement or contradiction:
>
> (1) furnishing or offering or promising to furnish – or accepting or offering or promising to accept – a valuable consideration in compromising or attempting to compromise the claim; and
>
> (2) conduct or statements made in compromise negotiations regarding the claim, except when offered in a criminal case and the negotiations related to a claim by a public office or agency in the exercise of regulatory, investigative, or enforcement authority.

FED. R. EVID. 408(a). As noted above, Rule 408 only bars the admission of evidence used "to prove liability for, invalidity of, or amount of a claim." If evidence is offered for another purpose, the Rule will not serve to preclude that evidence. Barker v. Niles Bolton Assoc., Inc., 316 Fed. Appx. 933, 937 (11th Cir. 2009) (finding that a settlement agreement was admissible because it was offered to prove the measure of damages sustained by the plaintiff, not to prove liability, invalidity of claims, or amount of claim).

In this case, the letters to which Defendants object discuss possible settlement amounts for repaying Plaintiffs when Defendants failed to rehire them for the 2006-2007 season. The letters should ordinarily be barred from admission, unless Plaintiffs demonstrate that these letters are offered for some

purpose other than entering information pertaining to prior settlement attempts. Plaintiffs attempt to argue that the letters are offered to show "Defendants' attitudes and animus towards Plaintiffs to prove the retaliation claim." (Doc. 100, p. 3.) However, this is an inappropriate reason to enter these letters into evidence. The attitudes of the Defendants when these letters were written are of little concern to the Court. The issue in this case is not whether Defendants had a bad attitude towards Plaintiffs; rather, the issue is whether Defendants engaged in retaliatory conduct prohibited by the FLSA. The letters serve no permitted purpose and cannot be admitted under FRE 408, and thus, are excluded from the Court's review.

### iv.  **Objection 4: Exhibits 3, 4, 6, 17, 94, 116**

Defendants object to exhibits 3 (Doc. 80-3), 4 (Doc. 80-4), 6 (Doc. 80-6), 17 (Doc. 82), 94 (Doc. 89-16), and 116 (Doc. 92-3) on the basis that these exhibits, all of which are affidavits, contain hearsay.

To make a proper objection to hearsay at the summary judgment stage, the objecting party must plead the objection with specificity. "A motion asserting only a general challenge to an affidavit will be ineffective." 10B Federal Practice & Procedure § 2738. The court will not honor general objections. Carr v. Alabama Dept. of Youth Services, 2009 WL 903280, at *2  (M.D. Ala. 2009) (declining to consider hearsay and relevancy objections because they were general and non-specific). If a moving party fails to specify the content in a proposed exhibit to which the party objects, the objection will be overruled.

Here, the objections from Defendants as to exhibits 3, 4, 6, 17, 94, and 116 are extremely vague. Defendants mention the exhibits by number, but there is no indication of the content within each exhibit that Defendants argue constitutes hearsay. The Court is not required to read through these exhibits in an attempt to discern those statements which might be objectionable under the hearsay standard. Due to the lack of particularity with which the objections to exhibits 3, 4, 6, 17, 94, and 116 are alleged, the objections are denied. If the Court determines while ruling on the merits of the motions that any parts of the exhibits contain hearsay, the Court will disregard the evidence as appropriate.

### v.  **Objection 5: Exhibits 43, 47, 57, 60, 108**

Defendants object to exhibits 43 (Doc. 84-5), 47 (Doc. 85-3), 57 (Doc. 86-3), 60 ((Doc. 86-6), and 108 (Doc. 91-4) on the basis that they are letters from various entities and constitute hearsay. Exhibits 60 and 108 are not letters, and the Court can only assume that the parties mistakenly listed these exhibits. Exhibit 60 is described on the exhibit list as "E-Verify Memorandum of Understanding" and exhibit 108 is described as "Referrals for Job Orders for Wendell Roberson Farms from January 1, 2004 to September 14, 2010." These exhibits are not what the Defendants purport them to be, and therefore, the objections to exhibits 60 and 108 are overruled.

Exhibits 43, 47, and 57 are, in fact, letters; however, Plaintiffs argue that they do not constitute hearsay because they fall within the public records

exception to the hearsay rule. The public records exception to the hearsay rule provides that

> [t]he following are not excluded by the hearsay rule, even though the declarant is available as a witness: (8) Records, reports, statements, or data compilations, in any form, of public offices or agencies setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel …

FED. R. EVID. 803(8)(A)-(B).

In this case, exhibit 43 is a series of letters from the Georgia Department of Labor to U.S. workers who had been referred to WRF in fall 2008. Exhibit 47 is a letter from Plaintiffs' attorney Dawson Morton, dated August 3, 2006 and addressed to Tash Van Dora, an attorney who formerly represented WRF. Finally, exhibit 57 is a letter from the United States Citizenship and Immigration Services addressing a Freedom of Information Act (FOIA) request from Jordan Cunnings of Georgia Legal Services. Applying the public record exception to the hearsay rule, exhibits 43 and 57 are deemed admissible as statements from public agencies falling within the scope of Rule 803(8).

Exhibit 47, a letter from one attorney to another, is not considered to be a public record. However, the Court sees no reason to exclude this letter from consideration. The letter is admittedly hearsay, but the contents of the letter could be reduced to admissible evidence during trial. When ruling on a summary judgment motion, the court may consider evidence that is submitted in a typically

inadmissible form, so long as the evidence could be properly submitted in admissible form at trial. McMillian v. Johnson, 88 F.3d 1573, 1584 (11th Cir. 1996). Here, exhibit 47 could be reduced to an admissible form through testimony at trial, and therefore, the Court overrules any objection to exhibit 47.

### vi.  Objection Six: Exhibits 8, 50, 56, 59, 95, 96, 97, 107, 113

Defendants object to exhibits 8 (Doc. 80-8), 50 (Doc. 85-6), 56 (Doc. 86-2), 59 (Doc. 86-5), 95 (Doc. 89-17), 96 (Doc. 89-18), 97 (Doc. 89-19), 107 (Doc. 91-3), and 113 (Doc. 92) on the basis that they are "argumentative, irrelevant in many respects, improper and inadmissible." Defendants also argue that admission of these exhibits into evidence would cause advocates to become witnesses. All of the exhibits except for exhibit 113 are letters that were written in the aftermath of the original Vergara-Perdomo litigation. The letters, all addressed to either the Robersons or to Tash Van Dora, WRF's attorney, are signed by either Charlotte Sanders or Dawson Morton, both attorneys at Georgia Legal Services. The letters vary slightly in content, but all are intended to address WRF's lack of compliance with certain terms of the judgment in the Vergara-Perdomo case or the consent orders that followed WRF's previous failure to comply.

The Court acknowledges that the letters themselves constitute hearsay, and the Federal Rules of Evidence would typically preclude the consideration of hearsay without a valid exception. However, in ruling on a summary judgment motion, the court may consider otherwise admissible evidence that has been

submitted in inadmissible form, although at trial the evidence would have to be presented in an admissible form. McMillian, 88 F.3d at 1584 (11th Cir. 1996). The content of these letters could be reduced to an admissible form through testimony at trial, and therefore, the Court finds that consideration of these letters is appropriate.

The Court also disagrees with Defendants' argument that the letters are irrelevant. As stated previously, a retaliation case must take into account the broader context of a work environment over time, not just an isolated incident. Thus, the letters are not irrelevant to the case at hand.

The Defendants' contention that the admission of the letters should be prohibited because the letters turn advocates into witnesses is also flawed. Charlotte Sanders, the author of six of the nine letters, is no longer employed with Georgia Legal Services, and therefore, her testimony is not problematic because she is no longer an advocate for Plaintiffs. Therefore, exhibits 8, 59, 95, 96, 97, and 107 are admissible.

On the other hand, Dawson Morton, the author of two of the nine letters, is currently representing Plaintiffs. However, Mr. Morton does not fit within the category of attorneys who are prohibited from potentially testifying under the Model Rules of Professional Conduct.

The Model Rules provide that "[a] lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless: (1) the testimony relates to an uncontested issue; (2) the testimony relates to the nature and value

15

of legal services rendered in the case; or (3) disqualification of the lawyer would work substantial hardship on the client." MODEL RULES OF PROF'L CONDUCT R. 3.7. Georgia courts have found that a "necessary witness" within the scope of Rule 3.7 is one whose testimony is "relevant to disputed, material questions of fact, and … there is no other evidence available to prove those facts." Schaff v. State, 304 Ga. App. 638, 640, 697 S.E.2d 305, 307 (Ga. App. 2010). "In determining whether to disqualify counsel, the trial court should consider the particular facts of the case, balancing the need to ensure ethical conduct on the part of the lawyers against the litigant's right to freely chosen counsel." Id.

In this case, Dawson Morton is not a necessary witness and the admission of his letters into evidence does not endanger any ethical standards. Thus, the Court overrules any objection to exhibits 50 and 56.

Exhibit 113 is a fax from Sid Roberson to Charlotte Sanders, addressing the number of farm workers employed in the spring season of 2007. The Court does not find the fax to be argumentative or improper, and because it was written by Sid Roberson, who is not an attorney, it does not turn an advocate into a witness. Thus, all objections to exhibit 113 are overruled.

### b. **Defendants' Motion for Summary Judgment**

The Complaint filed by Plaintiffs contains two counts: (1) FLSA retaliation in violation of 29 U.S.C. § 215(a)(3), and (2) breach of contract. (Doc. 1.) Defendants argue that summary judgment is appropriate on both counts. Both counts are dependent upon proving that Defendants retaliated against Plaintiffs

for engaging in protected activity under the FLSA, and Defendants argue that there is no evidence of retaliation that would support Plaintiffs' claims.

In analyzing FLSA retaliation claims, the Eleventh Circuit applies the burden-shifting framework from McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-06, 93 S. Ct. 1817 (1973). *See* Wolf v. Coca-Cola, 200 F.3d 1337, 1342 (11th Cir. 2000). A prima facie case of FLSA retaliation requires that the plaintiff demonstrate the following elements: "(1) she engaged in activity protected under [the] act; (2) she subsequently suffered adverse action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action" Id. at 1342-43. To properly establish the causation element, the plaintiff must prove that the adverse action would not have been taken "but for" the assertion of FLSA rights. Reich v. Davis, 50 F.3d 962, 965-66 (11th Cir. 1995).

If the plaintiff is able to establish the prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. Id. at 1343. If the employer is able to assert a legitimate reason for the employment action, the burden shifts back to the plaintiff to show that the employer's reasons are pretext. Id.

In this case, Defendants argue that Plaintiffs are unable to establish a prima facie case, and further, even if they are able to demonstrate the prima facie case, there is a legitimate, business reason that explains their decision not to rehire Plaintiffs that cannot be construed as a violation of the FLSA.

    i.  **Plaintiffs' Prima Facie Case**

The first element of the prima facie case – engaging in a protected activity – is easily established in this case. Plaintiffs filed an action under the FLSA against Defendants in June 2004, and thus, they are protected under the statute against retaliation for asserting their rights. 29 U.S.C. § 215(a)(3) (prohibiting any person from "discharg[ing] or in any other manner discriminat[ing] against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified about or is about to testify in any such proceeding, or has served or is about to serve on an industry committee").

The second element – that the plaintiff suffered an adverse employment action by the employer – is also established in this case. Defendants make a weak attempt to argue that Plaintiffs cannot show an adverse employment action because there is no duty to rehire in this case, and therefore, a failure to rehire does not constitute an adverse employment action. However, this argument misses the mark. Plaintiffs' claims do not center on a legally protected interest in re-employment. Instead, Plaintiffs' claims revolve around the legal right to be free from retaliation for filing suit under the FLSA. *See* Reyes-Fuentes v. Shannon Produce Farm, Inc., 671 F. Supp. 2d 1365, 1373 (S.D. Ga. 2009). Plaintiffs' legal interest in re-employment is irrelevant. Thus, the allegation that Defendants failed to rehire Plaintiffs because they filed an FLSA lawsuit is sufficient to demonstrate the existence of the second element of the prima facie case.

The third element – the existence, or lack thereof, of a causal connection between the protected activity and the adverse employment action – is disputed in this case. Defendants argue that Plaintiffs are unable to demonstrate that Defendants' decision not to rehire Plaintiffs was not for business reasons, and was instead direct retaliation for Plaintiffs' assertion of their FLSA rights in the 2004 lawsuit. Defendants contend that Plaintiffs' cannot show that "but for" the FLSA lawsuit, Defendants would have hired them for the 2008-2009 season.

In response, Plaintiffs argue that a timeline of the relationship between Plaintiffs and Defendants is sufficient to establish the causal connection. The original FLSA lawsuit was filed in 2004, and according to Plaintiffs, every year since the lawsuit was filed, legal force has been used to ensure that Plaintiffs were able to go back to work at Wendell Roberson Farms. In the 2005-2006 season, a consent order was issued ensuring Plaintiffs' employment. In the 2006-2007 season, attorney assistance was required to convince Defendants to rehire Plaintiffs. In 2007-2008, a court order was again issued demanding that Defendants rehire Plaintiffs. In 2008-2009, Defendants completely withdrew their H-2A request for the season, removing the possibility that Plaintiffs could work on the farm. This timeline, in Plaintiffs' view, demonstrates the requisite causal connection between the protected activity and the adverse employment action.

The Court is convinced that this timeline sufficiently demonstrates the third element of the prima facie case. Based on the timeline proposed by Plaintiffs, there is a causal connection between the original FLSA lawsuit and the adverse

employment action. Therefore, Plaintiffs have established the prima facie case for a FLSA retaliation claim.

### ii. **Defendants' Reasons for Its Employment Decision**

If a plaintiff is able to establish the prima facie case for retaliation under the FLSA, the burden shifts to the defendant to articulate a legitimate reason that explains the adverse employment action. <u>Wolf</u>, 200 F.3d at 1342-43.   In this case, Defendants articulate several reasons to justify their decision not to rehire Plaintiffs for the 2008-2009 season. First, Defendants state that Wendell Roberson Farms lost several of its largest customers, including Wal-Mart, Winn Dixie, and Save-a-Lot. (WRF Dep., p. 51.) Sid Roberson, Vice President of WRF, testified that the Wal-Mart contract was worth over $1,000,000 at one point, but by the 2006-2007 season, the contract was only $200,000 in value. (WRF Dep., p. 69-70.) Defendants allege that this loss of customers meant that the farm had less of a need for workers.

Second, Defendants contend that the "greens business" in which WRF was previously engaged was no longer profitable, leading to a dramatic decline in total revenue. According to Defendants, the total revenue for Wendell Roberson Farms in 2006 was $6,184,923.35, and by 2009, the total revenue had shrunk to $3,535,333.97, representing a 43% reduction in total revenues. (Doc. 47, p. 17.) Other business records also show a consistent decline in total income, total units

shipped, and total sales figures.[4] Id. Charles Powell, who worked as the CPA for WRF for a number of years, stated that he thought the farm needed to shut down because it was selling greens for less than it cost to produce them. (Deposition of Charles Powell, p. 23, 25-26.) The payroll manager, Lisa Bostick, testified that in the last ten years, she had observed the financial strain on the farm because customer needs had decreased. (Deposition of Lisa Bostick, p. 94.) She also noted that there was increased worry about paying the bills. (Bostick Dep., p. 94.)

Finally, Defendants claim that because of the slow economy, domestic plant closings led to a surge of available labor, which meant that there was no need to rely on the H-2A program to fulfill labor needs on the farm. (Doc. 47, p. 11.) Janis Roberson, Secretary and Treasurer of WRF, testified that the expense of the H-2A program became overwhelming as the farm's profit margin dropped, and thus, local workers were preferred to H-2A workers. She stated that

> we couldn't just continue to lose money; that's what we were doing, we were losing money. And it would have been nice to have brought some of the H-2As, but we couldn't pay the wage that they wanted. I think it was $8 something, and the regular hour work was cheaper.

(Deposition of Janis Roberson, p. 92.) Sid Roberson also commented that the H-2A program was "too costly." (WRF Dep., p. 171.) Additionally, Sid testified that local workers were available for the 2008 season because of plant closings in the

---

[4]     Defendants have offered into evidence numerous calculations showing WRF's production and revenue declining and profits shrinking substantially. The Court does not find it necessary to repeat those undisputed calculations here. For purposes of this Order, it is sufficient to say that Defendants have proven that WRF had fallen upon hard economic times.

area, including Sanderson Farms (WRF Dep., p. 142-43) and Chaparral Boats (WRF Dep., p. 209). Defendants argue that the influx of available local workers in the 2008 season combined with the declining profits at WRF led them to opt to use local workers instead of continuing their participation in the H-2A program.

Relying on these three reasons listed above, Defendants argue that legitimate business reasons supported their decision not to rehire Plaintiffs for the 2008-2009 harvest season.

The employer's burden for demonstrating a non-retaliatory reason that justifies the employment behavior has been described as "exceedingly light." Vessels v. Atlanta Ind. School Syst., 408 F.3d 763, 769-770 (11th Cir. 2005) (quoting Perryman v. Johnson Prod. Co., 698 F.2d 1138, 1141 (11th Cir. 1983)). The burden is satisfied so long as the employer articulates a clear and reasonable non-retaliatory basis for its actions. Id. The Court finds that the business reasons articulated by Defendants in this case are legitimate reasons that might justify the Defendants' decision not to rehire Plaintiffs, and thus Defendants have carried their burden.

### iii. Plaintiffs' Arguments that Defendants' Reasons are Pretext

If a defendant is able to articulate legitimate, non-retaliatory reasons for the employment decision, "the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the

reasons given by the employer were not the real reasons for the adverse employment decision." Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc). A reason is not pretext for discrimination unless it is shown both that the reason was false, and that retaliation was the real motivating factor behind the employment decision. Brooks v. County Com'n of Jefferson County, Ala., 446 F.3d 1160, 1163 (11th Cir. 2006). To determine whether the plaintiff has presented evidence of pretext sufficient to create an issue of fact on summary judgment, "the district court must evaluate whether the plaintiff has demonstrated 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997). Once the district court determines that a reasonable jury could conclude that the employer's proffered reasons were not the real reasons motivating the employment decision, the court "may not preempt the jury's role of determining whether to draw an inference of intentional discrimination from the plaintiff's prima facie case taken together with rejection of the employer's explanations for its action." Id.

In this case, Plaintiffs have submitted 118 exhibits and countless pages of depositions in their efforts to demonstrate pretext. The crux of Plaintiffs' argument is that summary judgment is inappropriate because an issue of material fact remains as to whether the business reasons articulated by Defendants are pretextual. Plaintiffs argue that Defendants' reasons are pretext

for two primary reasons. First, Plaintiffs claim that the evidence supporting Defendants' argument about their loss of sales is faulty. Second, Plaintiffs claim that despite any loss of sales, Defendant took on a number of new workers for the 2008-2009 harvest season. Plaintiffs argue that some, if not all, of these workers were illegally in the United States, and that Defendants' claim that there was an adequate supply of local workers to meet the needs of Wendell Roberson Farms is fabricated.

To support the argument that Defendants' reliance on sales figures was misplaced, Plaintiffs point out two significant facts. First, Plaintiffs highlight the fact that Defendants' sales are recorded on a calendar year basis (WRF Dep., p. 215), but the decision not to rehire Plaintiffs was not made after receiving sales information at the end of the year. Therefore, under Plaintiffs' theory, Defendants could not have made the decision based on the profit margins over the past year, since those numbers would not have been available at the time Defendants decided not to rehire. Also, Plaintiffs argue that Sid Roberson, who was deposed on behalf of Wendell Roberson Farms, was confused about what accounts the farm had lost and sold, which Plaintiffs interpret as a lack of candor about these accounts. (WRF Dep., 215-16.)

The Court is not convinced by Plaintiffs' argument that the evidence produced by Defendants about their sales revenue is faulty or intentionally false. A mix-up with accounts that were recently lost or a decision not to re-hire made during the summer instead of at the end of a calendar year do not seem to be

24

pretext for retaliation. Either action could be perfectly legitimate in a business setting and have nothing to do with retaliation.

However, the Court is convinced that there is a material issue of fact remaining about Plaintiffs' claim that despite a loss of sales, there was still a need for labor at WRF in the 2008-2009 season. Evidence has been presented by Plaintiffs in this case that convinces the Court that an question of fact remains for the jury as to the following assertions made by Plaintiffs: (1) the overall job market could not provide the labor that WRF needed; (2) illegal workers were employed by WRF during the 2008-2009 season; and (3) Defendants were unaware of their continuing legal obligations to try to remedy a history of discrimination.

### i. **Overall Job Market**

Defendants allege that in the 2008-2009 season, they no longer needed the H-2A program to supply their labor needs. However, Plaintiffs cast doubt on this assertion by pointing out that WRF relied on the H-2A program for over eighteen years and then, suddenly, had their labor needs fulfilled without H-2A workers. The Court finds that there is reason to doubt Defendants' assertion that their labor needs were met without the H-2A program.

First, WRF traditionally did not have a large number of U.S. workers available to work in the fields. Over the past five years, the H-2A job order submitted by Defendants to the DOL estimated that only two U.S. workers would be available to work. (Docs. 83-4, p. 6; 83-5, p. 6; 84, p. 6; 84-1, p. 6; 84-2, p. 6.)

25

Additionally, U.S. workers were notorious for working at the farm for a short time and then quitting after realizing the difficulty of the job. (Bostick Dep., p. 202-203.) In similar letters written to the Department of Labor in 2006 and 2007, WRF noted that "[w]e did not have any U.S. workers successfully complete last season except for the supervisors." (Doc. 84-3, p. 2, 4.)

Next, WRF did not undertake the same recruitment efforts in 2008 that it had in the past. In years prior, WRF would place newspaper ads, run radio announcements, send letters to former U.S. workers, and post job listings on the DOL's website to try to recruit local laborers to come to the farm. (Docs. 85 – 85-3.) Even with these recruitment efforts, the farm still needed the help of the H-2A program to fulfill its labor needs. In 2008, none of these advertisements were placed. (Bostick Dep., p. 198.)

Despite the lack of advertisements, Defendants claim that local workers were available in surplus because of plant closings in the area. Defendants assert that word of mouth spread the news about available work at WRF, and workers who had been terminated from their plant jobs came to the farm unsolicited. Sam Martinez, an agriculture specialist at the Department of Labor, recognized that word of mouth is often a tool that Hispanic workers use to learn about job availability. (Deposition of Sam Martinez, p. 20.) However, Martinez also notes that he has no personal knowledge of any workers from plant closings going to WRF. (Martinez Dep., p. 20.)

Finally, there is some doubt as to WRF's claim that the Department of Labor referred some U.S. workers to the farm. The DOL did refer seven workers to the farm; however, none of those workers were hired. (Doc. 84-4; Doc. 84-5.) Some workers did not show up for work, and others received letters from the DOL stating that the job order from WRF had been withdrawn. (Doc. 84-4; Doc. 84-5.) Eric Reed, who heard about the job opening through the DOL, testified that he worked for a week at WRF in 2008, but then received a letter from the DOL that said that the farm no longer needed workers. (Doc. 84-5.)

WRF's claim that it had no need for H-2A in the 2008-2009 season because of an influx of local workers is questionable because of evidence submitted by Plaintiffs showing that the farm did not anticipate hiring more than two local workers in the spring of 2008, the farm did not advertise job openings as they had in the past, the Department of Labor did not know of any referrals to the farm, and some local workers who were employed at the farm were told that the work order was cancelled. This evidence of the overall job market casts doubt on Defendants' claim that there was a sufficient labor force to meet the farm's needs and suggests that Defendants could be using this reason as pretext for discrimination.

ii. **Evidence of Illegal Workers**

Defendants allege that poor profit margins and fewer customer orders meant that there were not the same labor needs as in years past, which justifies their decision not to bring additional H-2A workers to WRF. However, Plaintiffs

27

have presented strong evidence that the farm was employing illegal workers instead of legal workers.

First, Plaintiffs have presented evidence of H-2A workers whose legal work visas have expired, but who are allowed to continue work at WRF. Luis Jaime Moreno worked at WRF for almost fifteen years. (Deposition of Luis Jaime Moreno, p. 21.) He originally was employed as an H-2A worker and worked on a seasonal basis. (Moreno Dep., p. 6.) However, since 2008, Moreno has been employed as a non-H-2A worker, making less money than he did as an H-2A worker. (Moreno Dep., p. 6.) Bernabe Sandoval is similarly situated. He worked as an H-2A worker at WRF for years, and then started work as a non-H-2A worker in 2008. (Deposition of Bernabe Sandoval, p. 28.) Though Sandoval testified that he cannot remember who at WRF told him to stay, he testified that he was informed that he should stay on at the farm, despite the fact that his visa would soon expire. (Sandoval Dep., p. 50.) Plaintiffs have presented a copy of Sandoval's H-2A visa which was set to expire in July 2007 (Doc. 88-6) and Sandoval's I-9 for the 2008 season, on which a box is checked reflecting that Sandoval was a citizen of the United States (Doc. 89-9). Janis Roberson knew Sandoval, and was unable to explain his claim to be a U.S. citizen in 2008. (J. Roberson Dep., p. 149.)

Other employees whose H-2A visas were set to expire and who now claim to be United States citizens include Josephina Ruiz (*compare* Doc. 89-3 with Doc. 89-11), Miguel Contreras Narvaes (*compare* Doc. 89 with Doc. 89-10),

28

Arnulfo Domingez Garcia (*compare* Doc. 89-5 with Doc. 89-12), Ruben Pineda Perez (*compare* Doc. 89-7 with Doc. 89-14), and Jose Juan Ponce Mendoza (*compare* Doc. 89-8 with Doc. 89-15). Bostick, the payroll manager, knew that some H-2A workers stayed in the United States as citizens, but did not question the transition from H-2A worker to citizen, attributing the shift to workers trying to avoid paying taxes by participating in the H-2A program. (Bostick Dep., p. 244-45.)

Next, WRF's claim of having sufficient legal workers is suspicious because of WRF's employment arrangement with Delfino Rodriguez, also known as "Roque." Rodriguez started work at WRF in 2005 (Deposition of Delfino Rodriguez, p. 7), bringing with him seven other farm workers (Rodriguez Dep., p. 10). He eventually was bringing so many people with him that he used a bus to transport the workers. (Rodriguez Dep., p. 17.) In 2008, WRF was loaning Rodriguez vans to bring in workers and paying drivers to operate the vans. (Rodriguez Dep., p. 22.) Despite his transportation of these workers, Rodriguez denies that he "finds" workers to bring to WRF, and also denies getting additional compensation for bringing workers to the farm. (Rodriguez Dep., p. 41-42.) During his deposition, he testified that workers call him to determine whether there is work available at WRF and he does nothing more than tell them whether there is or is not work. (Rodriguez Dep., p. 51-52.)

However, other WRF workers have testified that Rodriguez brings in illegal labor. Some, like Juan Pozos-Silva, testified to having general knowledge that

Rodriguez brings in illegal workers. (Deposition of Juan Pozos-Silva, p. 82-83.) Others, like Jaime Guijosa-Silva, a former H-2A worker, give more specifics. Guijosa-Silva submitted a declaration that stated

> [o]ne time I heard two of the workers that Roque brought to the farm saying that Roque had helped them find a person who brought them to the United States from Mexico without permission. They also said that Roque was deducting from their pay what he had spent so that this person would bring them across the border.

(Doc. 80-3, p. 3.)

There is also evidence that workers brought in by Rodriguez were using more than one identity. Bernardino Pozos Ramirez submitted a declaration that stated "[w]hen I worked in the field with Roque's other group, I realized that Roque called them by one name while he was directing their work and he said another name when they were filling out papers in the field." (Doc. 101-1, p. 3.) There is additional evidence that some workers were using multiple social security numbers on their tax documents at the farm. Plaintiffs have submitted evidence of twenty workers who have used multiple social security numbers during their tenure at WRF. (Doc. 85-7.) Plaintiffs have also submitted the declaration of Dawn Tindal Davis, a woman whose social security number is being used by a WRF worker on tax documents. Davis stated that she was unaware of the worker's use of her social security number and she never consented to any use of her information. (Doc. 85-8.)

The most damning evidence against Rodriguez is his salary. Bostick testified that Rodriguez is paid as a contractor, not as a laborer, which is different than all of the other farm workers. (Bostick Dep., p. 90.) Rodriguez testified that his salary is based on the production of the workers he supervises. (Rodriguez Dep., p. 51-52.) For example, he earns $0.50 per box of green cut by non-H-2A workers and $0.10 per box cut by H-2A workers. (Rodriguez Dep., p. 84.) The higher price for non-H-2A workers is attributed to Rodriguez's "expenses" with non-H-2A workers, including transportation costs and insurance costs. (Rodriguez Dep., p. 84.)

Rodriguez's salary is calculated in a variable way; however, this does not explain the great disparity that exists between some of his paychecks. Some weeks, Rodriguez's payroll information shows that he earns $100. (Rodriguez Dep., p. 65.) In other weeks, he will earn $14,000. (Rodriguez Dep., p. 65.) Plaintiffs have presented evidence that Rodriguez's total salary for 2008 was $158,869.90. In 2009, he earned $157,067.08. For a supervisor at a failing farm operation, this sum is either the result of extreme generosity on the part of the Robersons or some alternative arrangement with Rodriguez. Plaintiffs assert that Rodriguez pays illegal workers directly, and they offer as evidence Rodriguez's bank statements which show large withdrawals of cash on a semi-regular basis. (Doc. 82-13.)

Rodriguez's salary, along with evidence of WRF workers with multiple identities and WRF workers blatantly overstaying their H-2A visas, presents a

question of fact that must be decided by the jury. Plaintiffs have presented sufficient evidence to cast doubt on Defendants' contention that there was a local, legal source of labor that met their needs during the harvest season.

### iii. **Unawareness of Continuing Legal Obligations**

In a discrimination case, the court must take the entire context of the case into account, considering the history of the relationship between plaintiffs and defendants. *See* <u>United States v. City of Montgomery, Ala.</u>, 788 F. Supp. 1563, 1573 n. 12 (M.D. Ala. 1992). Therefore, in this case, it is impossible not to take the strained relationship between Plaintiffs and Defendants into consideration. Since 2004, when the original lawsuit was filed under the FLSA, two separate consent orders have been filed and numerous attorneys have been involved to attempt to ensure protection of Plaintiffs' rights. In an attempt to make sure WRF was complying with their legal obligations, the court imposed various requirements upon Defendants to ensure they were acting within the boundaries of the law. Plaintiffs have presented evidence in this case that Defendants were either unaware or intentionally disregarded those court-imposed obligations.

For example, after discovering that WRF was employing illegal workers brought in by Rodriguez in March 2006, the court ordered Defendants to participate in the SAVE/E-Verify program. (Doc. 1-3, p. 2.) This program is free and is accessed online. The program checks the authenticity of documents provided to an employer for tax purposes to determine whether the documents are legitimate. In this case, despite the court order, Defendants only rarely used

the program. Plaintiffs have presented evidence that Defendants only used the program fifteen times, and of those, seven resulted in tentative non-confirmations. (Doc. 86-3.) Additionally, Bostick, who was in charge of running workers' documents through the program, thought that the obligation to use the E-Verify program was finite and lasted only until the end of the season. (Bostick Dep., p. 268.) Sid Roberson and Janis Roberson also were unaware of the legal obligations associated with E-Verify. (S. Roberson Dep., p. 56; J. Roberson Dep., p. 135.) Janis Roberson testified that she stopped using E-Verify because it gave a bad result and she thought WRF employees could determine by looking at the documents whether they were authentic. (J. Roberson Dep., p. 135) (stating "… so we decided that we didn't think it was a very good idea to use it that much, because you can look at the papers yourself and tell whether or not they are legal.")

Additionally, the farm did not implement any other procedure for checking the authorization of workers. Sid Roberson and Janis Roberson both testified that if a worker has a valid form of identification, no further questions are asked. (S. Roberson Dep., p. 96; J. Roberson Dep., p. 148.) Bostick, who often helped workers complete their I-9 forms for employment, had a very informal procedure for checking the authorization of workers. She would check to be sure that the identification was not expired and it was on the list of acceptable forms of identification. (Bostick Dep., p. 235.)

While this lack of formal procedure for checking documentation from workers may be understandable, it is inexcusable when considered along with the knowledge of the former illegal labor practices at WRF. Sid Roberson testified that although he knew Rodriguez had previously brought illegal workers to the farm, he did not know of any steps taken by WRF to ensure that Rodriguez did not continue to bring illegal workers. (S. Roberson Dep., p. 169.) Janis Roberson also stated that there were no new procedures in place to ensure that Rodriguez avoided illegal practices. (J. Roberson Dep., p. 106.) Most shockingly, Eloy Alanis, a former WRF worker, testified that Janis Roberson knew he was using a fake identification. He testified

> I remember one time Mrs. Janis recognized me when she was giving out the checks. I asked for Jose Angel's check and she said to me in English, 'You're no Jose Angel, you're Eloy.' I told her that yes, I am. But that did not matter and the Robersons continued giving me employment under the name Jose Angel.

(Doc. 89-16, p. 3.)

Defendants' failure to use E-Verify or employ some other method for verifying employee identification, along with the apparent willful blindness of WRF management, casts doubt on Defendants' assertion that there was no retaliatory reason behind the decision not to participate in the H-2A program in 2008. If Defendants intentionally disregarded their legal obligations and knowingly employed illegal workers, then their decision not to rehire Plaintiffs in this case should be scrutinized more closely and could indicate retaliation.

In sum, Defendants have presented non-discriminatory reasons in an attempt to justify their decision not to participate in the H-2A program in the 2008-2009 season. However, the Court finds that Plaintiffs have come forward with the evidence necessary to suggest that Defendants' reasons could be pretext. Plaintiffs have presented evidence that the overall job market was insufficient to support WRF's labor needs and that, instead of legal workers, Defendants turned to illegal labor to harvest crops in the 2008-2009 season. The employment of Delfino Rodriguez, as well as the Defendants' knowledge of illegal hiring practices used in the past, supports this contention. The refusal of Defendants to employ any sort of precautionary procedures to ensure that illegal workers were not hired also gives an impression that illegal practices could have been employed at the farm.

These issues are not for the Court to decide, but instead, are matters of fact that require resolution by a jury. Thus, the Court denies Defendants' Motion for Summary Judgment.

### c. **Plaintiffs' Partial Motion for Summary Judgment**

Plaintiffs have moved for partial summary judgment on four different issues. First, Plaintiffs request that this Court grant summary judgment on Defendants' potential liability as "persons" under the FLSA. Second, Plaintiffs request summary judgment on the issue of Defendants' potential liability as "employers" under the FLSA. Third, Plaintiffs have filed for summary judgment on the issue of whether Sid Roberson and WRF should be considered "employers"

under H-2A regulations. Finally, Plaintiffs request summary judgment on five of Defendants' affirmative defenses. These issues are addressed below.

### i. Defendants' Potential Liability as "Persons" under FLSA

Defendants do not contest that Sid Roberson, Janis Roberson, and WRF are persons within the meaning of the FLSA. Therefore, summary judgment is granted in favor of the Plaintiffs on this issue.

### ii. Defendants' Potential Liability as "Employers" under FLSA

Under the FLSA, an employee can bring an action "against any employer" for claims involving wages, hours, or retaliation from a past FLSA violation. 29 U.S.C. § 216(b). The FLSA defines employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee …" 29 U.S.C. § 203(d). However, whether a person or entity falls within this definition "does not depend on technical or isolated factors but rather on the circumstances of the whole activity." Alvarez Perez v. Sanford-Orlando Kennel Club, Inc., 515 F.3d 1150, 1160 (11th Cir. 2008). In their Motion for Partial Summary Judgment (Doc. 55-1), Plaintiffs argue that Defendants Sid Roberson, Janis Roberson, and WRF all fall within the FLSA definition of "employer." In their response, Defendants admit the potential for being categorized as an "employer," but argue that the issue is fact-intensive and should be determined by a jury.

In the context of agricultural workers, the issue of whether a person or entity falls within the FLSA definition of "employer" turns on a factual inquiry. This

inquiry seeks to determine whether "as a matter of economic reality [the employee] was dependent upon [the defendant]." Patel v. Wargo, 803 F.2d 632, 635 (11th Cir. 1986). The inquiry looks to three factors:

> (1) whether the alleged agricultural employer has the power to direct, control, or supervise the worker of the work performed; (2) whether the alleged agricultural employer has the power to hire or fire, modify the employment conditions, or determine the pay rates or the methods of wage payment for the worker; and (3) the alleged employer's ownership in the employing company and whether the individual exercises significant control over the business's functions.

Ojeda-Sanchez v. Bland Farms, LLC, 2010 WL 3282984 at *5 (S.D. Ga. Aug. 18, 2010). In this case, Plaintiffs have presented enough evidence on these three factors to determine that summary judgment on this issue is proper in favor of Plaintiffs.

As to the first factor - the employers' power to direct, control, and supervise the work performed - the Court acknowledges that neither Sid Roberson nor Janis Roberson directly supervised the H-2A workers in the fields. However, both of the Robersons were in direct communication with Delfino Rodriguez, who supervised the workers in the fields pursuant to the directions of Sid Roberson and/or Janis Roberson, about the work that needed to be done at the farm and how many workers were needed at any given time. (Rodriguez Dep., p. 14-15.) Additionally, there is evidence that Janis Roberson once demoted an employee from a position in the barn because she was angry that the employee was participating in a lawsuit against WRF. (J. Roberson Dep., p. 68-69.) This shows

that Janis had the power to control employees and determine their positions at WRF. Defendants' direct control over Delfino Rodriguez, as well as their apparent power to shift employees from one position to another, convinces the Court that the first factor weighs in favor of a finding that Defendants do qualify as "employers."

The second factor, whether the employer has the power to hire or fire, modify employment conditions, or determine pay rates, also weighs in favor of finding that Defendants are "employers." Both Sid Roberson and Janis Roberson had the power to make employment decisions that directly affected Plaintiffs. Plaintiffs have shown that Sid Roberson and Janis Roberson made decisions about how many H-2A workers were needed each season. (WRF Dep., p. 73.) Thus, they were the ones who ultimately made the decision not to rehire Plaintiffs in 2008. (WRF Dep., p. 73.) These decisions constitute hiring and firing, both indicators of employer status.

Plaintiffs have also presented evidence that Defendants controlled the employees work environment. As stated above, Janis Roberson had previously exercised her power to direct and control which specific jobs employees worked. (J. Roberson Dep., p. 68-69.) In addition to controlling employees during working hours, there is also evidence that Defendants controlled the living arrangements for the H-2A workers employed at the farm. Defendants determined where the H-2A workers would live and collected rent from them. (WRF Dep., p. 88-89.) There have even been allegations that Defendants controlled the air conditioning in the

units where Plaintiffs lived, and would turn off the air conditioning as punishment. (J. Roberson Dep., p. 71.)

Plaintiffs have also presented evidence that Defendants determined the pay for workers and executed the paychecks. While the H-2A program sets a mandatory minimum hourly wage for immigrant workers, the employer is responsible for setting the specific amount of wages paid to each employee. *See* 20 C.F.R. § 655.122(a) (dictating that the employer must provide to H-2A workers "at least the same level of minimum benefits, wages, and working conditions which must be offered to U.S. workers"). For these reasons, the Court has determined that the second factor weighs in favor of finding that Defendants are "employers."

Finally, the third factor - the alleged employer's ownership in the employing company – also weighs in favor of Plaintiffs. Defendants Sid Roberson and Janis Roberson were majority shareholders at WRF. (PSMF ¶ 9.) Sid is the Vice President of WRF and Janis is the Secretary and Treasurer. (PSMF ¶ 8.) Both are heavily involved in the management decisions of the farm. (PSMF ¶ 10.)

Despite Defendants' argument that they are not, as a matter of law, involved at WRF at the level necessary to be considered employers, after reviewing the facts, the Court finds that no issue of fact remains as to the status of Defendants under FLSA. Defendants attempt to argue that this case is like Ojeda-Sanchez, 2010 WL 3282984, where the employers did not fall within the scope of the FLSA definition of "employers" because they were not involved with

the farm at the level necessary to be deemed employers. However, unlike Ojeda-Sanchez, Defendants in this case performed more than just managerial functions. This family farm was overseen and run by Defendants and they were deeply involved at WRF in many ways. Thus, Sid Roberson, Janis Roberson, and WRF are all considered "employers" within the scope of the FLSA, and summary judgment is granted in favor of Plaintiffs on this issue.

### iii. **Defendant Thomas S. Roberson and WRF's Potential Liability as Employers under H-2A Regulations**

Plaintiffs argue that Sid Roberson and WRF should be deemed employers under the H-2A contract as a matter of law. In response, Defendants argue that they should not be treated as employers, citing the same reasons that they used to dispute that Sid Roberson and WRF were not employers under the FLSA.

Federal regulations defining the employer/employee relationship under H-2A are almost identical to the standards set by the FLSA. An H-2A employer is defined as one who "suffers or permits" a person to work. 20 C.F.R. § 655.103(b). Such an employer is characterized by his ability to "hire, pay, fire, supervise or otherwise control the work of such employee." Id. These factors are almost identical to the factors that are used to determine whether an employer falls within the FLSA definitional scope. Therefore, the Court deems that, for the same reasons that Sid Roberson and WRF are deemed to be "employers" within the context of the FLSA, they are also deemed to be "employers" under the H-2A contracts.

iv. **Defendants' Second, Third, Fifth, Sixth, and Eighth Defenses**

Plaintiffs have requested summary judgment on Defendants' second, third, fifth, sixth, and eighth defenses. Defendants do not contest summary judgment on the second, third, fifth, and sixth defenses, and therefore, summary judgment is granted in favor of the Plaintiffs on those defenses. However, the eighth defense is disputed by the parties.

The eighth defense raised by Defendants is the statute of limitations. The Complaint in this case was filed on March 12, 2012. Defendants argue that the statute of limitations for both the FLSA claim and the breach of contract claim is two years, and therefore, both claims are barred by the statute of limitations. These arguments are analyzed below.

Count I under Plaintiffs' Complaint is a violation of the FLSA. Under 29 U.S.C. § 255(a), the statute of limitations for an action under the FLSA is two years, except for "a cause of action arising out of a willful violation." If the violation is willful, then the statute of limitations is expanded to three years. Id. In this case, Plaintiffs have alleged a willful violation of the FLSA, and therefore, the statute of limitations is three years from the date of accrual.

The date of accrual in this case is not, as Defendants argue, when the contracts were executed. Instead, the cause of action for retaliation began to accrue when Plaintiffs were denied employment at WRF – the spring of 2008 for four of the Plaintiffs, and the fall of 2008 for eight additional Plaintiffs. Yearwood

v. Holloway, 2005 WL 1926605 at *5 (M.D. Ga. Aug. 11, 2005) (finding that the statute began to accrue on a teacher's retaliation claim when she learned that her contract was not being renewed); Hayes v. Delaware State Univ., 726 F. Supp. 2d 441 (D. Del. 2010) (determining that a Title VII retaliation claim accrued when the employment decision was made and the employee is notified of the decision); Muhammad v. Wilkins Group, Inc., 2009 WL 2923017 at *4 (E.D. Mo. Sept. 9, 2009) (determining that an FLSA retaliation claim was untimely because the petition was filed more than three years after the last claimed acts of retaliation). Therefore, because the statute of limitations for willful violations of the FLSA is three years and the date of accrual is the spring or fall of 2008, Plaintiffs' filing of the Complaint in March 2010 is within the statute of limitations.

Count II of the Plaintiffs' Complaint alleges a breach of contract. The Defendants claim that the statute of limitations is two years according to O.C.G.A. § 9-3-22, a Georgia statute governing the recovery of wages. On the other hand, Plaintiffs argue that O.C.G.A. § 9-3-24 should apply, the Georgia statute governing contracts in writing which gives a six year statute of limitations.

Federal courts in Georgia have applied both two-year and six-year statutes of limitations to breach of contract claims like the one at hand. This Court adopts the six-year statute of limitations. The Southern District of Georgia adopted this approach as well, stating that despite the application of a two-year limit in some courts, the Southern District was of the opinion that regulations governing the H-2A program expressly state that the job clearance order creates a contract

between the employer and worker, and therefore, the six-year statute of limitations specified in O.C.G.A. § 9-3-24 applies. Ramos-Barrientos v. Bland, 728 F. Supp. 2d 1360, 1382 (S.D. Ga. 2010). Other courts have also agreed with this six-year statute of limitations. *See* Arriaga-Zacarias v. Lewis Taylor Farms, Inc., 2008 WL 5115005 (M.D. Ga. Dec. 4, 2008); Escolastico De Leon-Greanados v. Eller and Sons Trees, Inc., 452 F. Supp. 2d 1282 (N.D. Ga. 2006); Morales-Arcadio v. Shannon Produce Farms, Inc., 2006 WL 140590 (S.D. Ga. 2006). This Court adopts a six-year statute of limitations in this case because the claim arises out of a contract between Plaintiffs and WRF, executed when WRF completed the job clearance order necessary to bring Plaintiffs to work from Mexico, and therefore, O.C.G.A. § 9-3-24 controls.

All twelve Plaintiffs worked for Defendants at least until 2006, and therefore, filing the complaint in March 2012 was well within the six year statute of limitations. The statute of limitations is not an applicable defense to Count II of the Plaintiffs' Complaint. Therefore, summary judgment shall be granted in favor of Plaintiffs on the defense of the statute of limitations.

IV. **CONCLUSION**

In sum, Defendants were unable to prove, as a matter of law, that their decision not to participate in the H-2A program in the 2008-2009 season was not retaliatory in nature. Therefore, summary judgment is denied. Plaintiffs were able to prove that Defendants were "employers" under the FLSA and the H-2A program, as well as proving that the Defendants' statute of limitations defense

was meritless. Therefore, partial summary judgment is granted in favor of Plaintiffs. With issues of fact still remaining, this case shall be set for trial in July 2012.

SO ORDERED, this 13th day of March, 2012.

*s/ Hugh Lawson*
HUGH LAWSON, SENIOR JUDGE

ebr